```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF GEORGIA
                   COLUMBUS DIVISION


UNITED STATES OF AMERICA,         *

vs.                               *
                                         CASE NO. 4:08-CR-08-002 (CDL)
SHAWN BUNKLEY, a/k/a Biscuit,     *

       Defendant.                 *

                                  *
```

ORDER

Defendant pled guilty to a superseding information that charged him with conspiring to possess with intent to distribute more than 500 grams of cocaine. The United States Attorney's Office for the Middle District of Georgia stipulated in its non-binding plea agreement with Defendant that Defendant should be held accountable for between 500 grams and two kilograms of cocaine for sentencing purposes. At the sentencing hearing, the Court found that Defendant was responsible for 138 kilograms of cocaine and sentenced Defendant to 110 months imprisonment, which sentence substantially exceeded the advisory guideline range calculated in the presentence report. The Court explained on the record the rationale for its variance sentence. Because of this substantial variance, the presence of several unique legal issues involved in this sentencing, and the fact that no party in this case will likely file a brief in support of the Court's sentence on appeal, the Court finds it appropriate to issue

this written Order explaining its rationale for the sentence in this case.[1]

## THE ADVISORY GUIDELINE RANGE

The presentence report calculated Defendant's advisory guideline range to be 37-46 months based upon an offense level of 21 and criminal history category of I. The offense level, which drove the guideline range calculation, was based upon a stipulation by the Government in its non-binding plea agreement with Defendant that the amount of drugs that Defendant should be held accountable for was between 500 grams and two kilograms.

The Court found that the presentence report accurately calculated the advisory guideline range *based upon the stipulated drug amount*; however, the Court was concerned that the amount of drugs directly attributable to Defendant and all reasonably foreseeable quantities of drugs that were within the scope of the criminal activity that Defendant jointly undertook, substantially exceeded the stipulated amount. The Court finds it useful to provide

---

[1]The Court believes it adequately explained its rationale on the record at the sentencing hearing. However, the Court's oral explanation may not have been as thorough and as organized as this written Order, which will hopefully assist the court of appeals in making an informed decision on any appeal. This Order may be particularly helpful in this case where the U.S. Attorney's Office will be unable to file a brief in support of the sentence. Since the U.S. Attorney's Office stipulated to a drug amount in its plea agreement with Defendant, it is bound to honor that stipulation. It would be a breach of the plea agreement for the U.S. Attorney's Office to make any argument contrary to the stipulation, and thus, the U.S. Attorney's Office cannot support the Court's sentence in this case.

some background that explains the Court's skepticism as to the amount of drugs to which the Government had willingly stipulated.

## BACKGROUND

The Court was well familiar with the drug conspiracy from which Defendant's charges arose. The drug bust that led to these charges was touted by the U.S. Attorney's Office and law enforcement as the biggest drug bust in the history of Columbus. Melanie Bennett, *Record Bust Drug and Money Seizures: Officials Say Group Supplied Drugs to Six Counties in Columbus Area*, Columbus Ledger-Enquirer, May 6, 2005, at A1. Numerous indictments were obtained that had some connection to the bust, and the Court was familiar with many of the players having previously taken guilty pleas from and sentenced some of them. The bust also produced a high-profile indictment of a prominent local attorney, Mark Shelnutt, who represented the purported leader of the drug conspiracy. *See United States v. John Mark Shelnutt,* Case No. 4:09-CR-14.

The alleged leader of the drug conspiracy in which Defendant was involved was Torrance Hill, who the Court had previously sentenced to 294 months based on a finding that he was responsible for 316 kilograms of cocaine, 154 grams of cocaine base, and 848 kilograms of marijuana. *See United States v. Torrance Hill,* Case No. 4:05-CR-26. The Court had also sentenced one of Hill's lieutenants, who played a role in the conspiracy similar to Defendant, to 120 months based upon

a stipulated drug quantity of forty-three kilograms of cocaine. *See United States v. Cortez Johnson,* Case No. 4:08-CR-45.

The Court was also aware of the U.S. Attorney's Office's aggressive pursuit of Hill's attorney, Shelnutt, on money laundering and drug conspiracy charges, and its attempt to turn Hill, Defendant, and other co-conspirators in the Hill drug operation against Shelnutt by obtaining their cooperation against him. The Court was particularly struck by the zeal with which the U.S. Attorney's Office pursued Shelnutt and the Court became concerned when it learned of information suggesting that the U.S. Attorney's Office had crossed the line from independent prosecutor to law enforcement. At a hearing on a motion to dismiss the indictment against Shelnutt based on alleged prosecutorial misconduct, the Assistant U.S. Attorney who was in charge of the present Bunkley case admitted that he had attempted to surreptitiously tape an interview with Shelnutt, and when Shelnutt asked him whether the interview was being taped, the Assistant U.S. Attorney informed him that it was not, which was untrue. The Assistant U.S. Attorney acknowledged at the hearing that he should not have been dishonest about the taping, but that he thought at the time that his approach had been approved in advance by his supervisor, and thus was appropriate. In light of the U.S. Attorney's Office's relentless pursuit of Shelnutt, the Court became concerned that the U.S. Attorney may have made deals with various co-

conspirators to gain their cooperation against Shelnutt, rather than based upon their own actual criminal conduct.[2]

Defendant's deal was not the only sweetheart deal in the various cases arising from this massive conspiracy. The U.S. Attorney's Office also agreed to let two other significant co-conspirators off with nothing more than pretrial diversion. *See United States v. Latea Davis,* Case No. 4:08-CR-08-001; *United States v. Choici Lawrence,* 4:08-CR-08-007. In addition, the Government entered into a plea agreement with another major player in the conspiracy which resulted in a stipulated drug amount of 200-300 grams of cocaine when evidence existed that the defendant in that case arguably was responsible for multiple kilograms of cocaine. *See United States v. Santwan Holt,* Case No. 4:08-CR-08-005.

With this background, the Court became concerned that the focus of the U.S. Attorney's Office was on getting a high-profile lawyer and negotiating sweetheart plea deals with the actual drug dealers to accomplish that. The U.S. Attorney's Office maintains that it made the various deals with the other co-conspirators, including Defendant, because of a lack of evidence tying them to the larger drug

---

[2]The Shelnutt case was officially prosecuted by Assistant U.S. Attorneys from the Southern District of Georgia due to a conflict of interest involving the Middle District U.S. Attorney's Office. Nevertheless, it was apparent that the Middle District U.S. Attorney's Office was involved to some degree in the investigation, as evidenced by the surreptitious taping of Shelnutt and its continued representation of the Government in the cases against the various co-conspirators who testified against Shelnutt pursuant to cooperation agreements negotiated by the Middle District U.S. Attorney's Office.

conspiracy. They claim that the only evidence they had would have been testimony from other members of the conspiracy, the credibility of which could be attacked at trial. Yet, that is the same type of evidence that the Government relied upon to indict Shelnutt and take his case to trial. Thus, the Court found the U.S. Attorney's rationale unpersuasive.

Based on the foregoing, the Court had concerns that the judgment of the U.S. Attorney's Office may have become clouded by its zeal to bring down a prominent criminal defense attorney. Thus, the Court determined that the stipulated drug amount in Defendant's plea agreement should be closely scrutinized. Consequently, rather than blindly accept the Government's plea agreement with Defendant, including the stipulated drug amount, the Court continued the first sentencing hearing and informed Defendant and the Government that the Court intended to summons witnesses to the next hearing to make an independent determination as to the amount of drugs for which Defendant should be held accountable. (*See* Tr. 12:11-13:4, 13:24-14:5, Oct. 21, 2009 (Doc. 300) ("10/21 Tr.").) In the meantime, the Court tried the case of Hill's attorney, at which the Court learned of additional information that confirmed its skepticism as to the agreement the U.S. Attorney had reached with Defendant regarding his involvement in the drug conspiracy.[3]

---

[3]The Court derives no satisfaction in its criticism of the U.S. Attorney's Office. It has found the Assistant U.S. Attorneys who regularly practice in this Court to be competent professionals. The Court also does

THE MARK SHELNUTT TRIAL

Prior to Defendant's sentencing, the Court tried the case of *United States v. Mark Shelnutt*, Case No. 4:09-CR-14. In that case, the Government indicted Shelnutt, a local attorney, in a forty-count indictment alleging offenses ranging from money laundering to drug conspiracy. Shelnutt had represented Torrance Hill, and the Government alleged that Shelnutt assisted Hill with laundering proceeds from his drug operation. At trial, Bunkley testified on behalf of the Government that he had delivered large amounts of cash to Shelnutt on behalf of Hill. As part of his trial testimony, Bunkley testified that his own involvement in the drug operation was substantial. Construing his testimony conservatively, Bunkley admitted responsibility for at least 138 kilograms of cocaine, far in

---

not seek to publicly embarrass any of these public servants, and therefore, the Court does not name them in this Order. Moreover, the Court notes that the Assistant U.S. Attorney stationed in the Columbus Division did not represent the Government in the Shelnutt case or the present case, and thus none of the Court's comments in this Order are directed at him. Notwithstanding the Court's reluctance to criticize the Government's attorneys who did handle these cases, the Court finds it important to make these observations regarding its perception of their performance as it relates to the context in which this Court made its sentencing decisions in this case. The Court also points out that it did not perceive the Assistant U.S. Attorney who was on the front lines in the present case as a rogue assistant making these significant decisions on his own, but instead as an inexperienced front line soldier following orders from his experienced supervisors who were approving these decisions. (*See* 10/21 Tr. 8:6-8 (stating that "all of these plea agreements were obviously approved by [the Assistant U.S. Attorney's] management as well"); *see also id.* at 11:4-5 (stating that plea agreement consideration "went to the highest levels of management within [the U.S. Attorney's] office").)

excess of the paltry two kilograms to which the Government had stipulated.[4]

At trial, the Government dismissed three of its counts against Shelnutt and the jury acquitted Shelnutt on the rest. Thus, the Government lost its high-profile conviction. Perhaps more disturbing to the Court, however, was the fact that in the process, the Government had stipulated to certain relevant conduct by Bunkley, which if agreed to by the Court, would result in a major participant in one of the City's largest drug conspiracies escaping with a modest sentence of between thirty-seven and forty-six months.[5] The Court subsequently informed Bunkley that it intended to consider his trial testimony in determining his relevant conduct for sentencing purposes and for whether a variance was appropriate. (Order, Nov. 19, 2009 (Doc. 307).)

DECEMBER 10, 2009 SENTENCING HEARING

At the sentencing hearing, the Court called one of the case agents who was primarily responsible for investigating the Hill drug operation and who was familiar with Defendant's participation in it. Agent Jonathan Memmo testified that Defendant's involvement during the

---

[4]Bunkley's testimony from the Shelnutt trial was admitted as Exhibit 1 at his December 10, 2009 sentencing hearing. (*See* Ex. 1 to Dec. 10, 2009 Sentencing Hr'g, Bunkley Tr., Nov. 11, 2009 (Ex. 1 to Doc. 310) ["11/11 Bunkley Tr."].)

[5]The U.S. Attorney, in fact, sought a downward departure for Bunkley based on his substantial assistance. Thus, from the perspective of the U.S. Attorney, a sentence of less than thirty-seven months would have been appropriate, which the Court finds astonishing.

8

period alleged in his indictment far exceeded the 500 grams to two kilograms that the Government had stipulated to in its plea agreement with Defendant. He explained that two of the co-conspirators in the case had provided specific information that Defendant was responsible for a minimum of 138 kilograms of cocaine. Agent Memmo testified that based on his familiarity with the investigation and the conspiracy, he was convinced that Defendant was involved at least to this extent. Agent Memmo based his testimony on information that was independent from any information obtained from Defendant subsequent to Defendant's cooperation agreement with the Government. His evaluation of Defendant's relevant conduct did not come from Defendant but from independent sources, two fellow co-conspirators.

The Court provided Defendant's counsel with an opportunity to object to the Court's consideration of an upward variance. Defendant's counsel objected to the testimony of Agent Memmo, contending that it was not credible because it was based upon information from two informants who had something to gain from their cooperation. The Court rejected this argument and found Agent Memmo's testimony credible. Defendant also objected to the Court using the trial testimony of Defendant, which Defendant claims would violate U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.8's prohibition against using information obtained pursuant to a cooperation agreement in the determination of the guideline range. Although not necessary to the Court's sentencing ruling, the Court likewise rejected this

objection as explained more fully below. Accordingly, the Court sentenced Defendant to a variance sentence outside of the advisory guideline range.

## THE UPWARD VARIANCE AND SENTENCE

The Court found that Defendant's own trial testimony and the testimony of Agent Memmo independently established that Defendant should be held accountable for at least 138 kilograms of cocaine.[6] Rather than make a *de novo* finding as to relevant conduct different from the stipulated conduct in the presentence report or make an upward departure using the guidelines, the Court found it more appropriate to evaluate an upward variance. The Court recognized that § 1B1.8 would not permit it to use Defendant's own testimony, which was given pursuant to a cooperation agreement with the Government, in determining the guideline range. Thus, the Court accepted the advisory guideline range calculation as accurate given the constraints of § 1B1.8. However, as explained more fully in the remainder of this Order, the Court concluded that § 1B1.8 only applied to a *determination of the guideline range* and did not apply to a *variance* from that range. Moreover, even if the Court could not consider Defendant's own testimony in determining his relevant conduct, the testimony of Agent Memmo independently supported the Court's findings and sentence.

---

[6]This estimate is conservative. At one point during the Shelnutt trial, Bunkley admitted to dealing in 200 kilograms of cocaine. (*See* 11/11 Bunkley Tr. 55:5-8.)

In determining the extent of the variance, the Court first calculated what Defendant's advisory guideline range would have been had the Government not stipulated as to the amount of drugs and had Defendant been held accountable for the amount that the Court found the evidence supported—at least 138 kilograms. Based on that amount, his guideline range would have been 108 to 135 months considering an offense level 31 and a criminal history category I.[7] The Court further took into consideration that Defendant did provide some assistance for which he should have gotten some credit, and therefore, the Court found that he should be sentenced near the lower end of the variance range. Based on the foregoing and the statutory factors to be considered, as enumerated in 18 U.S.C. § 3553(a), the Court sentenced Defendant to 110 months.

## LEGAL ISSUES

Preliminarily, the Court found that its variance sentence was completely supported by the testimony of Agent Memmo. The Court found his testimony credible and that it accurately reflected Defendant's relevant conduct. Since that testimony was based on information from sources that were independent from Defendant's own trial testimony, it should support Defendant's sentence even if it is found that the Court cannot rely upon Defendant's own testimony. *See United States*

---

[7] The variance offense level calculation is based on the following: base offense level of 36 based on 50-150 kilograms of cocaine, U.S.S.G. § 2D1.1(a)(5) (citing U.S.S.G. § 2D1.1(c)(2)); reduced two levels by safety valve, U.S.S.G. § 2D1.1(b)(11); reduced three levels for acceptance of responsibility, U.S.S.G. § 3E1.1(b).

*v. Pham,* 463 F.3d 1239, 1244 (11th Cir. 2006) (per curiam) ("[S]o long as the information is obtained from independent sources or separately gleaned from codefendants, it may be used at sentencing without violating § 1B1.8.").

Although not necessary to uphold the Court's sentence, the Court does find that Defendant's own testimony corroborates Agent Memmo's testimony as to Defendant's true relevant conduct. Using Defendant's testimony to support the sentence, however, does present an issue of first impression in this Circuit: When a defendant enters into a non-binding plea agreement with the Government, which includes a stipulation by the Government as to the amount of drugs for which the defendant should be held accountable and also includes a cooperation agreement whereby the Government agrees, pursuant to § 1B1.8, not to use any self-incriminating information obtained during the cooperation against the defendant for purposes of determining his guideline range, is the Court prohibited from *sua sponte* taking into consideration the defendant's subsequent trial testimony as to the drug amount in deciding whether a variance sentence should be imposed when that trial testimony substantially conflicts with the stipulated drug amount in the plea agreement and when that trial testimony is corroborated by other independent testimony from a law enforcement officer familiar with the nature and extent of the relevant conduct?

It is clear that the Court did not have to accept the stipulation of drug amount contained in Defendant's plea agreement with the

12

Government.  (*See* Shawn Bunkley Plea Agreement 3-4, 7, July 23, 2009 (Doc. 263) ("Plea Agreement").)  The plea agreement was not binding on the Court, and Defendant was so informed both in the written plea agreement (*see id.*) and in the Court's colloquy when Defendant entered his plea (Tr. 15:10-14, July 23, 2009 (Doc. 280)).  Moreover, Defendant was specifically informed that the Court's refusal to accept recommendations in his plea agreement would not provide Defendant with the right to withdraw his guilty plea.  (*Id.* at 15:20-16:2.)  Thus, Defendant cannot complain that the Court's refusal to accept the stipulated drug amount violated any of his constitutional or contractual rights.  The Court also notes that the Government opposes the upward variance and thus it has not breached its plea agreement with Defendant.

The next question is whether it is appropriate for the Court to use Defendant's own testimony as the basis for its findings regarding his true relevant conduct.  The plea agreement provided in relevant part as follows:

> If Defendant cooperates truthfully and completely with the Government, including being debriefed and providing truthful testimony, at any proceeding resulting from or related to Defendant's cooperation, the United States Attorney will make the extent of Defendant's cooperation known to the sentencing court. . . .  If the cooperation is completed prior to sentencing, the Government agrees to consider whether such cooperation qualifies as "substantial assistance" . . . warranting the filing of a motion . . . recommending a downward departure from the applicable guideline range.

(Plea Agreement 5-6.)  The plea agreement also provides:

13

> Pursuant to Section 1B1.8 of the United States Sentencing Guidelines, the Government agrees that any self-incriminating information which was previously unknown to the Government and is provided to the Government by Defendant in connection with Defendant's cooperation and as a result of Defendant's plea agreement to cooperate will not be used in *determining the applicable guideline range*. Further, the Government agrees not to bring additional charges against Defendant . . . based on any information provided by Defendant in connection with Defendant's cooperation[.][Emphasis added by the Court.]

(*Id.* at 6-7.) Neither the plea agreement nor § 1B1.8 addresses whether Defendant's self-incriminating testimony may be used in determining a *variance* to the advisory guideline range. The guideline and plea agreement specifically refer *only* to "determining the applicable *guideline range*" not a *variance from it*. U.S.S.G. § 1B1.8 (emphasis added). At least one circuit has held, however, that a sentence is *per se* unreasonable if the sentencing judge relies upon information provided by the defendant as part of his cooperation agreement. *See United States v. Milan,* 398 F.3d 445, 455-57 (6th Cir. 2005) ("[A] sentence based on facts found through a violation of § 1B1.8 would be unreasonable."). This approach assures a cooperating defendant of limited use immunity for any information he supplies pursuant to his cooperation. The problem with this approach is that it expands § 1B1.8 beyond its plain and unambiguous language which restricts its application to a guideline range determination. Moreover, this broad interpretation has the effect of making this single guideline mandatory rather than advisory, which is arguably inconsistent with *United States v. Booker*, 543 U.S. 220 (2005), and

14

its progeny.  With all due respect to the Sixth Circuit, the Court finds that since the plea agreement in this case is not binding on the Court and since advisory guideline § 1B1.8 does not apply to a variance, neither the agreement nor the guideline automatically restrict the Court's discretion in imposing an upward variance based upon Defendant's subsequent trial testimony, unless by doing so the Court violates Defendant's Fifth Amendment right against self-incrimination.

The Court finds that because Defendant was not compelled to provide the testimony upon which the Court relied and because Defendant did not assert his Fifth Amendment right prior to providing the testimony, no constitutional violation occurred.  The Fifth Amendment protection against self-incrimination is not self-executing. *United States v. Vangates,* 287 F.3d 1315, 1320 (11th Cir. 2002). "Rather, as a general rule, to be protected a witness must assert that right specifically.  Thus, a witness's answers 'are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of privilege.'" *Id.* (quoting *Minnesota v. Murphy,* 465 U.S. 420, 427 (1984)).  Furthermore, "'if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself.'"  *Murphy*, 465 U.S. at 427 (quoting *Garner v. United States,* 424 U.S. 648, 654 (1976)).

15

For purposes of sentencing in this case, the Court assumed that Defendant was compelled to testify at the trial of *United States v. Shelnutt* pursuant to his plea agreement because if he did not do so, the Government would have been justified in not filing a 5K motion for reduction of his sentence based on substantial assistance. Thus, Defendant had an obligation to testify truthfully at the trial. However, this does not mean that he had an obligation to answer every question that was propounded to him. The Court finds that it was not objectively reasonable for Defendant to conclude that if he refused to answer questions that had the potential to contradict the stipulated drug amount in the plea agreement that he would have lost the benefit of the cooperation provisions of his plea agreement. While he could not have lied, he could have sought to invoke his Fifth Amendment right against self-incrimination and simply refused to testify as to the exact amount of cocaine that he participated in conspiring to distribute. *See Murphy,* 465 U.S. at 427-29, 434-39 (concluding that since probationer was not informed that assertion of the privilege against self-incrimination would result in imposition of a penalty, and in light of Supreme Court decisions proscribing threats of penalties for the exercise of Fifth Amendment rights, probationer could not reasonably have feared that the assertion of the privilege would have led to revocation). The Court finds that Defendant was not placed in a position such that he had a reasonable belief that if he refused to answer every question posed to him, he

would lose the benefit of his cooperation agreement with the Government. Instead, the Court finds that Defendant had the free choice to invoke his Fifth Amendment rights, and his failure to do so means that his testimony, and subsequent consideration of it by the Court, does not violate his constitutional right against self-incrimination.[8] Accordingly, the Court finds that reliance upon Defendant's trial testimony in determining the drug amount for purposes of a variance sentence does not violate Defendant's Fifth Amendment rights; but, even if it does, the sentence in this case is fully supported by the independent testimony of Agent Memmo.

## CONCLUSION

For all of these reasons and the reasons stated at Defendant's sentencing hearing, the Court determines that a sentence of 110 months is consistent with and required by the sentencing considerations enumerated in 18 U.S.C. § 3553. It takes into consideration the true nature and circumstances of the offense and the history and characteristics of Defendant. It reflects the actual serious nature of the illegal conduct in which Defendant was engaged and promotes respect for the law. In addition, it provides a just punishment for

---

[8] The Court notes that Defendant should not have been surprised that these questions may be asked at trial nor that any responses he gave would be of interest to the Court for purposes of his sentencing. Prior to his trial testimony, Defendant, who was represented by counsel, was notified that the Court was concerned about the amount of drugs that he should be held accountable for and that the Court intended to explore additional evidence at the sentencing hearing. (*See* 10/21 Tr. 12:11-13:4, 13:24-14:5.) Thus, before Defendant gave his trial testimony, he was on notice of the Court's skepticism as to the Government's stipulation regarding the drug amount.

the offense, particularly in light of the sentences given others similarly situated to Defendant. The sentence should also afford adequate deterrence for this Defendant in the future and for others who may contemplate engaging in similar unlawful conduct. Finally, the sentence will protect the public for a reasonable period of time from further crimes of this Defendant.

The Court recognizes that its sentence in this case may also have some negative consequences. It could send a message that defendants now have less assurance in this Court that the Government's sentencing recommendations will be followed, and that it is possible that information defendants provide pursuant to a cooperation agreement may be used to their detriment instead of their benefit. The Court acknowledges that this could result in fewer defendants being willing to cooperate against other defendants, thus presenting extra challenges for the Government in future cases.

While the Court does not discount these concerns altogether, the Court finds that they pale in significance to the alternative: to allow a significant drug dealer, who was a major player in one of the largest drug conspiracies in the City's history, to return to the streets after serving a sentence that is typically given to the most modest street-level dealer. Such a sentence would not be consistent with the nature and consequences of the offense; nor would it reflect the seriousness and breadth of Defendant's illegal activities. While such a sentence may promote a respect for Government deal-making with

cooperating defendants, it would likely diminish the average citizen's respect for the law.  It would allow a convicted defendant to escape a just punishment and, because of the lenient sentence, would likely not deter him or others similarly situated from future criminal conduct.  Such a lenient sentence would certainly not protect the public to the same degree that the Court's sentence will.

Congress has determined that an appropriate statutory sentencing range for this crime is five to forty years.  *See* 21 U.S.C. § 841(a)(1), (b)(1)(B).  The sentencing guidelines advise that a defendant involved in criminal activity to the extent that Defendant has admitted, which activity has also been independently corroborated, should spend between 108 and 135 months in prison.  Based on the foregoing, the Court humbly submits that its sentence of 110 months is eminently reasonable, necessary, and authorized under the law.

IT IS SO ORDERED, this 14th day of December, 2009.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE